```
            IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF TEXAS
                    DALLAS DIVISION

UNITED STATES OF AMERICA, )
                          )
          Plaintiff,      )
                          )
vs.                       )  3:20-CR-00567-B
                          )
ANDREW CHARLES BEARD,     )
                          )
          Defendant.      )
```

```
                  SENTENCING HEARING
        BEFORE THE HONORABLE JANE J. BOYLE
           UNITED STATES DISTRICT JUDGE
                  MAY 24, 2023
```

```
               A P P E A R A N C E S
For the Government:

     UNITED STATES ATTORNEY'S OFFICE
     1100 Commerce Street - 3rd Floor
     Dallas, TX  75242
     214/659-8600
     BY:  GARY C. TROMBLAY
          CAMILLE ELIZABETH SPARKS
          ANDREW J. BRIGGS

For the Defendant:

     MICHAEL MOWLA, PLLC
     PO Box 868
     Cedar Hill, TX  75106
     972/795-2401

     THE GRAY LAW FIRM, PLLC
     1012 Ridge Road
     Rockwall, TX 75087
     972/771-5525
     BY:  GREG GRAY
```

2

APPEARANCES CONTINUED:

        LAW OFFICE OF TIM MENCHU
        2603 Oak Lawn Avenue - Suite 200
        Dallas, TX  75219
        214/766-1394
        BY:  A. TIM MENCHU

        LAW OFFICE OF JUSTIN K. HALL, PC
        328 West IH-30 - Suite 2
        Garland, TX  75043
        972/226-1999
        BY:  JUSTIN K. HALL


COURT REPORTER:    SHAWNIE ARCHULETA, TX CCR No. 7533
                   1100 Commerce Street
                   Dallas, Texas 75242

proceedings reported by mechanical stenography,
transcript produced by computer.

```
 1                    (In open court at 1:30 p.m.)
 2                    THE COURT:  Good afternoon.  This is
 3      Case Number 3:20-CR-567, United States versus Andrew
 4      Beard.
 5                    Who is here for the government?
 6                    MR. TROMBLAY:  Gary Tromblay for the
 7      government.
 8                    MR. BRIGGS:  Andrew Briggs for the
 9      government.
10                    MS. SPARKS:  Camille Sparks for the
11      government.
12                    THE COURT:  Okay.  And for the defense?
13                    MR. GRAY:  Greg Gray for Mr. Beard.
14                    THE COURT:  I'm sorry, Greg?
15                    MR. GRAY:  Gray.
16                    THE COURT:  Gray.  Uh-huh.
17                    MR. MOWLA:  I'm Michael Mowla for
18      Mr. Beard.
19                    THE COURT:  Michael?
20                    MR. MOWLA:  Mowla.
21                    THE COURT:  Okay, Mowla.  And?
22                    MR. MENCHU:  And Tim Menchu.
23                    THE COURT:  Yeah, Mr. Menchu.  Okay.  And
24      of course Mr. Beard is here.
25                    I would like you, Mr. Menchu, I think
```

```
 1    you're lead counsel, but you if you're not, Mister-
 2    -- who is lead counsel?
 3              MR. GRAY:  I'm lead counsel, Your Honor.
 4              THE COURT:  Mr. Gray, would you and
 5    Mr. Beard come over here, please, to the lecturn?
 6              Okay.  We're going to go over the
 7    paperwork first.
 8              Are you ready to go, Mr. Beard?
 9              THE DEFENDANT:  Yes, ma'am.
10              THE COURT:  Okay.  So you know today is
11    your sentencing.
12              THE DEFENDANT:  Yes, Your Honor.
13              THE COURT:  Okay.  We're going to go over
14    several things and lots of objections and lots of
15    presentations.  So just be prepared.
16              All right.  Before I begin, I want to
17    place you under oath, so raise your right hand.
18              (The Defendant was sworn.)
19              THE DEFENDANT:  Yes, ma'am.
20              THE COURT:  Okay.  All right.  Let's look
21    at the presentence report first.  This is the first
22    one.
23              Have you reviewed this with Mr. Gray,
24    front and back, word by word, page by page?
25              THE DEFENDANT:  I have, Your Honor.
```

```
 1              THE COURT:  Do you understand it
 2   completely?
 3              THE DEFENDANT:  Yes, ma'am.
 4              THE COURT:  Mr. Gray, do you agree with
 5   that?
 6              MR. GRAY:  I do.
 7              THE COURT:  Okay.  Next I have the
 8   government's objections to the presentence report.
 9   Those are on Document 82.
10              Have you read through those objections
11   again, word by word, page by page, with Mr. Gray
12   before today?
13              THE DEFENDANT:  Yes, ma'am.
14              THE COURT:  And Mr. Gray, do you agree
15   with that?
16              MR. GRAY:  I do.
17              THE COURT:  Okay.  Then I have your
18   objections on Document 85, Beard's objections to the
19   PSR.
20              Have you read through those very
21   carefully, word by word, page by page?
22              THE DEFENDANT:  Yes.
23              THE COURT:  Do you understand them?
24              THE DEFENDANT:  I do.
25              THE COURT:  Anything you disagree with
```

```
 1   about?

 2              THE DEFENDANT:  No, ma'am.

 3              THE COURT:  Mr. Gray?

 4         MR. GRAY:  I agree, he has reviewed those.

 5              THE COURT:  Then I have the government's

 6   response to your presentence report objections,

 7   Document 86.  And have you read through the

 8   government's response to your presentence objections

 9   very carefully with Mr. Gray before today?

10              Just go ahead and look at them.  I want

11   you to look at them very carefully.

12              THE DEFENDANT:  I have read it, Your

13   Honor.

14              THE COURT:  Do you understand it?

15              THE DEFENDANT:  Yes, ma'am.

16              THE COURT:  Any questions about it?

17              THE DEFENDANT:  No, ma'am.

18              THE COURT:  Mr. Gray, do you agree with

19   that?

20         MR. GRAY:  I do.

21              THE COURT:  Okay.  Now I have the motion

22   for downward departure under 5K.

23              Have you read through this -- it's

24   Document 87 -- very carefully?

25              THE DEFENDANT:  Yes, ma'am.
```

```
 1                THE COURT:  Do you understand it?
 2                THE DEFENDANT:  Yes, ma'am.
 3                THE COURT:  Do you agree with it?
 4                THE DEFENDANT:  Yes, ma'am.
 5                THE COURT:  Mr. Gray?
 6                MR. MENCHU:  I do.
 7                THE COURT:  Then I have the addendum to
 8      the PSR.  It's Document 88-1.
 9                Have you read through the addendum very
10      carefully, page by page, word by word with Mr. Gray?
11                THE DEFENDANT:  Yes, ma'am.
12                THE COURT:  Okay.  Do you understand it?
13                THE DEFENDANT:  I do.
14                THE COURT:  Mr. Gray?
15                MR. GRAY:  I agree.
16                THE COURT:  Then I have the government's
17      statement regarding the PSR, which is Document 89.
18      It's a short statement.  They have an objection to
19      it.  Okay?  Do you understand that?
20                THE DEFENDANT:  Yes, ma'am.
21                THE COURT:  Any question, Mr. Gray?
22                MR. MENCHU:  No, Your Honor.
23                THE COURT:  All right.  Then I have
24      Beard's sealed objections to the addendum to the
25      PSR, Document 90.
```

```
 1              Have you read through those very carefully
 2   with Mr. Gray before today?
 3              THE DEFENDANT:  Yes, Your Honor.
 4              THE COURT:  Understand them completely?
 5              THE DEFENDANT:  I do.
 6              THE COURT:  Anything you want to add to
 7   them?
 8              THE DEFENDANT:  Not at this time, no.
 9              THE COURT:  Take out?
10              THE DEFENDANT:  No, ma'am.
11              THE COURT:  Okay.  Mr. Gray, do you agree?
12              MR. GRAY:  I do agree.
13              THE COURT:  Okay.  Then I have the impact
14   statement -- do you get the impact statement or not?
15              MR. GRAY:  No.
16              THE COURT:  Okay.  I have two impact
17   statements.  And then I have numerous letters for
18   you, and I have read them all.  And I'm not going to
19   tell you who they're from, because you know.
20   They're pretty -- I've read them all.
21              Anything else I should have, Mr. Beard?
22              THE DEFENDANT:  No, ma'am.
23              THE COURT:  Mr. Gray?
24              MR. GRAY:  No, Your Honor.
25              THE COURT:  Mr. Tromblay?
```

```
 1              MR. TROMBLAY:  No, ma'am.
 2              THE COURT:  Okay.  Well, let's start by
 3    going through the objections, and I don't think you
 4    need to stand there, Mr. Beard.  You can go to the
 5    side.
 6              MR. GRAY:  Your Honor, Mr. Mowla will be
 7    handling the objections on behalf of Mr. Beard.
 8              THE COURT:  Do you want to go through the
 9    old ones and the new ones, or which one?  Not only
10    if you have withdrawn the old ones and they're
11    not -- just tell me.  Let's go through Document 82
12    first.
13              MR. MOWLA:  82 -- do you mean 85, Your
14    Honor?
15              THE COURT:  Oh, yes, sorry.
16              MR. MOWLA:  Your Honor, on Document 85,
17    I'm sure you notice, I write pretty detailed
18    objections for a reason.  I -- I don't have much to
19    add other than just simply responding briefly,
20    unless the Court wants to go through each individual
21    one.
22              THE COURT:  No.  On the factual
23    assertions, Mr. Tromblay, I believe you didn't take
24    any position on them?
25              MR. TROMBLAY:  That is correct, Your
```

```
 1   Honor.  That's on Objections 1 through 12 and 15
 2   through 17.
 3            THE COURT:  Okay.  One through 12 and 15
 4   through 17, we don't need to address.  I'm just
 5   going to accept your objections.  Okay?
 6            MR. MOWLA:  Okay.  Yes, Your Honor.
 7            THE COURT:  Let's go to 13.
 8            MR. MOWLA:  Yes, ma'am.
 9            THE COURT:  Okay.  Restitution.
10            MR. MOWLA:  Your Honor, on Objection
11   Number 13, Page 8, Paragraphs 21 through 26, the
12   only point I was making is, obviously, if there is a
13   judgment in a civil proceeding, you know, that would
14   be in addition to any restitution --
15            THE COURT:  Well, he won't get double
16   recovery -- I mean, she won't get double recovery.
17            MR. MOWLA:  Correct.  And as of right now,
18   there is no civil judgment.  But I just want to
19   point that out to the Court, that there were
20   proceedings, and that's the only point I objected to
21   in 13, Your Honor.  I do recognize that unless there
22   is a judgment, that, you know, there won't be any
23   arguments about double recovery.  But I believe I
24   had to make the objection to bring it to the Court's
25   attention for it to be raised late.  I didn't want
```

1   to waive that objection.  That's all it was, Judge.

2          THE COURT:  Mr. Tromblay, do you have

3   anything to say about that?

4          MR. TROMBLAY:  No, ma'am.

5          THE COURT:  You agree with me?

6          MR. TROMBLAY:  Yes, ma'am.

7          THE COURT:  Let's move to Objection Number

8   14.  I think this is a big one.  Oh, well, go ahead.

9   You tell me.

10          MR. MOWLA:  Objection 14, the only point I

11   was making -- and it's in Paragraph 29 -- Mr. Beard

12   obviously pleaded guilty to Count 3, to 924(c).  And

13   this is not an attempt to withdraw the guilty plea.

14   If it would have been, I would have gone to the Carr

15   Factors and filed a motion, but that's not the point

16   here.

17          When I file objections, one of the

18   purposes is to try to mitigate any potential upward

19   variance.  And my only point was, is that I believe

20   that based on the arguments I made and the law, I

21   don't think the elements clause of 924(c) was met.

22   But I do acknowledge, though, that based on the

23   facts and the guilty plea, the residual clause, was

24   met.  So my point here simply was, I didn't want to

25   waive any objections to potentially the issue about

```
1    the elements clause.  That's -- that -- that's all
2    Objection 14 was.
3                THE COURT:  Mr. Tromblay, will you speak
4    into the microphone?
5                Do you have anything to say about that?
6                MR. TROMBLAY:  I cannot say anything
7    beyond what my response to his objection was.  And
8    to be short about this, the -- the stalking offense
9    that he pled guilty to, which is the underlying
10   offense, the 924(c), as we've demonstrated does meet
11   the elements clause.
12               THE COURT:  Does meet the elements clause,
13   and you think it doesn't meet the elements clause.
14               MR. MOWLA:  And that was my objection
15   based on the arguments I made, Judge.  That's all it
16   was.
17               THE COURT:  All right.  I find that it
18   does meet the elements clause, but it doesn't
19   matter, I don't think, either way.  Right?
20               MR. MOWLA:  Because it meets -- I think it
21   meets the residual clause, I don't think it will
22   change the outcome, Your Honor.
23               MR. TROMBLAY:  If I could add, Your Honor,
24   the Supreme Court has said that the residual clause
25   is unconstitutional and that for a 924(c) to be --
```

```
 1              THE COURT:  Can you hear him?

 2              THE COURT REPORTER:  No.

 3              THE COURT:  Okay.  Say it again, and speak

 4  up.  Speak into the mic.

 5              MR. TROMBLAY:  Your Honor, the residual

 6  clause in the 924(c), the Supreme Court has held

 7  that to be unconstitutional.  So that for a 924(c)

 8  conviction to be proper, it's got to meet -- the

 9  underlying offense has to meet the elements clause,

10  which we have demonstrated this particular offense

11  does.

12              THE COURT:  Okay.  Like to say anything

13  else, Mr. Mowla?

14              MR. MOWLA:  Just so my -- I understand by

15  the objection, Your Honor, I don't think because you

16  can commit that particular crime, 2261A, without

17  committing an act of violence, I don't think it

18  meets the elements clause.  And that's all I have to

19  say, Your Honor.

20              THE COURT:  Okay.  I overrule that

21  objection.

22              Okay.  How about -- let's see.  That was

23  15?  16?  15?  No.  okay.  We are --

24              MR. MOWLA:  I think it's Number 18, Your

25  Honor, Objection Number 18 on Page 14.
```

```
 1              THE COURT:  Okay.  I'm sorry.
 2              Number 18.  Okay.  I'm not going to do an
 3     upward departure.
 4              MR. MOWLA:  Okay.  Okay.  Then --
 5              THE COURT:  Mr. Tromblay, I've decided I'm
 6     not going to do an upward departure because of the
 7     way I'm going to handle this, but go ahead and argue
 8     it if you want.
 9              MR. TROMBLAY:  No, ma'am.  I believe that
10     the government has properly addressed Objection
11     Number 18.
12              THE COURT:  Okay.  Let me just see there.
13     Okay.  I'm not going to upwardly depart.  Okay?  All
14     right.
15              Mr. Mowla, I'm going to go through the
16     objections, but I would like to talk to Mr. Tromblay
17     about this 5K motion, please.  Come on up.
18              I don't see anything more than he's
19     admitting to what he did, but tell me why it's a 5K,
20     because I'm not seeing it.
21              MR. GRAY:  Your Honor, I hate to
22     interrupt.  But due to the sensitive nature of the
23     information in that motion, and it's under seal, may
24     we approach the bench?
25              THE COURT:  Yeah.  The defendant can come
```

```
1   up.  The defendant should be able to come up.

2           (Bench conference sealed; filed as Sealed

3   Bench Conference 1.)

4           THE COURT:  Motion is denied.

5           Okay.  And now, Mr. Mowla, the other

6   objections.  I think they're the same.  Maybe you

7   have one other.

8           MR. MOWLA:  Really, the only other

9   relevant objection, Your Honor, that's not factual,

10  is in Document Number 90.

11          THE COURT:  Yeah, Document 90, I have it.

12          MR. MENCHU:  And that pertains to the

13  3A1.3, unlawful restraint enhancement, the two-level

14  enhancement.

15          THE COURT:  Let me find that.  Let me find

16  it.  Where is it?  Is it the --

17          MR. MOWLA:  I'm sorry, it's in -- it was

18  accepted by the second probation officer in this

19  case, in the addendum, Your Honor, in 88.1 or 88-1.

20          THE COURT:  Okay.  And then you -- they

21  objected to that, right?

22          MR. MOWLA:  Well, we objected to the

23  addendum.

24          THE COURT:  I get it.  Okay.

25          MR. MOWLA:  Yes.  Yes.  And Document 90 is
```

1  our objection to the addendum, 88-1.

2        THE COURT:  Okay.

3        MR. MOWLA:  Okay.

4        THE COURT:  Okay.  So go ahead and tell me

5  about that.

6        MR. MOWLA:  Yeah, Your Honor.  The second

7  probation officer on this case accepted the

8  government's request for the 3A1.3, unlawful

9  restraint, a two-level enhancement.

10        And my argument, Your Honor -- and again,

11  I acknowledge there isn't a 5th Circuit case

12  directly on point, but there is a public 4th Circuit

13  case that I think directly is on point.

14  Mikalajunas, I believe is the way the case name is

15  pronounced.  And Mikalajunas -- well, first off, I

16  want to address one thing with regard to the factual

17  assertion.

18        There was a factual assertion that

19  Mr. Beard grabbed the victim in this case from

20  behind.  I didn't see any evidence of that, that

21  there was any grabbing.  And that grabbing seemed to

22  be at least a significant part of the government's

23  argument that the 3A1.3 enhancement should apply.

24        Second, as Mikalajunas explains, a

25  restraint is part and parcel to a killing.  Just

1    like a restraint is part and parcel to a robbery,

2    it's part and parcel to a killing.  And Mikalajunas

3    specifically involved a killing with a stabbing, and

4    that's what happened in this case as well.

5              So, you know, 3A1.3, Part 2, talks

6    about -- and I'm paraphrasing here -- a double

7    dipping isn't allowed.  So if you have a case where

8    the underlying charged offense, itself, involves

9    some sort of restraint, the punishment and the range

10   of punishment is already built into the underlying

11   offense.

12             One of them obviously is robbery or

13   aggravated robbery or robbery in interstate

14   commerce, as it would be in federal court, and

15   another is a case involving a death.  And so we

16   don't -- we don't believe that the 3A1.3 objection,

17   based on our Rule 5 pages of briefing on this should

18   be applied, and we ask the Court to overrule that

19   objection.

20             THE COURT:  Thank you very much.

21             MR. MOWLA:  Thank you.

22             THE COURT:  Mr. Tromblay, if you will come

23   up here and give his piece.

24             MR. TROMBLAY:  Your Honor, I really don't

25   have much to add beyond what was in the government's

1    objection.

2                THE COURT:  Go ahead and tell me.

3                MR. TROMBLAY:  Showing that this, in fact,

4    was a restraining.

5                THE COURT:  Why?

6                MR. TROMBLAY:  It's a restraining, because

7    Mr. Beard -- in fact, Mr. Mowla represented that

8    there was no evidence that he grabbed the victim.

9                On Page 6 of the factual resume that he

10   signed, and I quote, "Realizing that Burkett was

11   still alive, Beard exited the SUV, ran back to

12   Burkett and grabbed her from behind and stabbed her

13   13 times through the upper body with a sharp

14   object."  He's made that admission.

15               The Mikalajunas case that he cites was

16   wrongly decided.  The Checora case points out, which

17   the government has briefed in its objections, and

18   it's wrong for this reason -- two, primarily.

19   Number one, restraint is not an element in every

20   single murder case.  The dissent in Mikalajunas

21   points that out.

22               For example, if I were to shoot a victim

23   to death from afar, I have not restrained them in

24   any way.  If I poisoned them, I have not restrained

25   them.  If I shove them off a building and they fall

1    to their death, I have not restrained them.  And I
2    can give the Court countless cornucopia of examples
3    as to why that's not the case.
4          And second, it's not double dipping,
5    because as the Checora case pointed out, and the
6    cases I cited in the government's objection,
7    restraint is not an element of the stalking offense.
8    It may be how he did it, which is why the restraint
9    application applies under the guidelines, but it's
10   certainly not an element of the offense, such as if
11   this were a kidnapping case, which the guideline
12   commentary clearly states would be the type of case
13   where it would be double dipping.
14         In this case, as I pointed out to the
15   Court, a plain reading of the statute that Mr. Beard
16   is convicted under and also the 5th Circuit's
17   Pattern Jury Instructions, in no way is restraint an
18   element whatsoever in this offense.  And therefore,
19   it is not double dipping, and the Mikalajunas case
20   does not apply, and that case is wrongly decided.
21         Considering everything that we have said,
22   this is a prototypical case of why, why that -- why
23   that enhancement applies.  In fact, what he did was
24   morally apprehensible.  This victim was badly
25   wounded after sustaining a shotgun blast to the

1    head.  Thinking that he had killed her, that the
2    blast, itself, was going to be sufficient, he was on
3    his way back to escape whenever the victim exited
4    her car, wounded badly, posing no threat to him or
5    to anyone else.  And realizing that she was still
6    alive, he then ran up behind her, and, in his words
7    in the factual resume that he signed, he grabbed her
8    from behind and then stabbed her 13 times through
9    the upper body until she was dead.  That is why that
10   enhancement applies.
11          And for this reason, we would ask the
12   Court to -- to grant the two-level enhancement and
13   apply it to Mr. Beard.
14          THE COURT:  Mr. Mowla, come on up.
15          Anything else?
16          MR. MOWLA:  Yes, Your Honor.
17          THE COURT:  Yeah.
18          MR. MOWLA:  Judge, Mr. Tromblay's
19   argument, when he says restraint is not an element
20   of the offense, that would be correct if this was a
21   2261A case not involving a death.  But there was a
22   death involved.  Death is the ultimate form of
23   restraint.  And the plain language of 3A1.3 gives
24   examples of the type of restraint.
25          Now, I think the objection Mr. Tromblay

```
 1   was talking about, or the type of restraint
 2   enhancement falls under 2B3.1(b)(4)(B), which I
 3   discuss in Paragraph 12.  They didn't make an
 4   objection under that part of the guidelines, they
 5   made an objection under 3A1.3.  Okay?
 6            And again, part two of that -- part one
 7   gives some examples of the type of restraint.  Part
 8   two talks about that if the underlying offense
 9   itself involves a restraint, that you don't apply
10   the enhancement.  There's no greater restraint than
11   a murder.  And that's the bottom line of the
12   objection, Your Honor.  That's all I have.
13            THE COURT:  Mr. Tromblay, anything else?
14            MR. TROMBLAY:  Yeah, I will just be brief.
15            THE COURT:  No, no, come up here so we can
16   all hear you.
17            MR. TROMBLAY:  Your Honor, in the
18   government's objection, I cited cases that addressed
19   specifically this enhancement.  Quote:  Keeping
20   someone from doing something is inherent within the
21   concept of constraint.  That's exactly what he did
22   here.
23            More importantly, I have cited cases as
24   examples, United States v. Roberts, where a victim
25   was held behind the neck -- was held around the neck
```

1    at knifepoint.  The Court held that the application

2    was properly applied because the victim was denied

3    freedom of movement.

4              THE COURT:  And it wasn't double dipping?

5              MR. TROMBLAY:  No, it's not double

6    dipping.

7              THE COURT:  Okay.  Okay.

8              MR. TROMBLAY:  Same thing.  United States

9    v. Plenty, which is an 8th Circuit case, restraint

10   of victim enhancement applied because the defendant

11   was exercising control over the victim that

12   prevented her freedom of movement, prevented her

13   escape and facilitated the offense.  That's exactly

14   what happened here.

15             And lastly, by way of example, I cited the

16   Melendez case out of the District Court of New

17   Mexico, where, likewise, the defendant placed the

18   victim in a chokehold, and they found that was

19   sufficient for the application of the enhancement.

20             This is exactly why we have the

21   enhancement, the exact facts -- I mean, this case

22   screams for it.  And in considering the facts, which

23   is what drives -- which is what is driving this

24   point, this application is properly applied to

25   Mr. Beard, and we would ask the Court to give it.

```
 1              THE COURT:  Mr. Mowla, anything else?
 2              MR. MOWLA:  Very briefly, Your Honor.
 3              THE COURT:  Okay.  This is it.
 4              MR. MOWLA:  This is it.
 5              Judge, once again, those cases that
 6      Mr. Tromblay described, we didn't have an ultimate
 7      restraint of murder.  I mean, obviously, if you put
 8      a knife to someone's neck in a robbery, you're
 9      restraining them.  Okay?
10              But again, under this particular
11      sentencing guideline that is at issue here, this --
12      again, you know, if they wanted to make an objection
13      under a different guideline they could have, but
14      they did not.  We responded based on this particular
15      two-level enhancement.
16              And again, based on Mikalajunas and, you
17      know, it was also cited in the footnotes of the
18      5th Circuit case, we did not believe that it's
19      appropriate and applies, because it eventually
20      merges into the ultimate restraint of murder.
21              That's all, Your Honor.
22              THE COURT:  Okay.  I think it's close.
23      I'm going to give it to the government, though.  I
24      think they're right.  We'll see if they're right.
25              But I would like everyone to come up here,
```

```
 1   please, once again.  We're going to talk about the
 2   topic.
 3              (Bench conference sealed; filed as Sealed
 4   Bench Conference 2.)
 5              THE COURT:  Do you want to come up here?
 6              (Probation officer approaches the bench;
 7   discussion off the record.)
 8              THE COURT:  Okay.  Is that all the
 9   objections, Mr. Mowla?
10              MR. MOWLA:  All the objections you have
11   from me.
12              THE COURT:  Any other objections from the
13   government that we need to deal with?
14              MR. TROMBLAY:  No, that's all, Your Honor.
15              THE COURT:  Okay.  I'm going to rule -- I
16   ruled on the objections.  So now I'm going to adopt
17   the presentence report and the addendum as the
18   findings and conclusions of the Court.
19              And we have a 41, because we just gave him
20   one point -- 41 and a one.  And the -- if you could
21   help me out with Count 2.  What is the guideline
22   range?  Is it 360 to 405?
23              USPO:  So, Your Honor, the guideline
24   range, Your Honor, would be 42 and a one --
25              THE COURT:  It's 42 minus one.
```

```
 1            USPO:  -- minus one for the departure.
 2    And so the correct total offense level should be 42.
 3    However, with the departure of 41 and a one, that
 4    would yield a 324-month to 405-month guideline
 5    sentence as to Count 2.
 6            THE COURT:  Okay, as to Count 2.
 7            And consecutively -- Count 3 would be 10
 8    years consecutively to all other counts.
 9            Okay.  It is time for whatever evidence
10    you have, and I will start with the defense.
11            MR. GRAY:  Your Honor, at this time we
12    would like to call Lealon Raley to address the
13    Court.
14            THE COURT:  Who?
15            MR. GRAY:  Lealon Raley.
16            THE COURT: Lealon Raley.  Okay.
17            Come on up here.
18            He's not a fact witness, right?
19            MR. GRAY:  No, Your Honor.
20            THE COURT:  State your name for the
21    record, please.
22            MR. RALEY:  My name is Lealon Raley.
23            THE COURT:  Speak into the microphone.
24            MR. RALEY:  My name is Lealon Raley.
25            MR. GRAY:  That's as close as it will go.
```

```
 1              THE COURT:  Go ahead.
 2              MR. RALEY:  I am Lealon Raley.  I am
 3    Andrew Beard's uncle.  I'm his power of attorney.  I
 4    met him when he was 4 years old.  We grew close.
 5    And for the last 30 years, it's like he's like the
 6    son I never had.  He's like a brother to my only
 7    daughter.  And I just in my wildest dreams could
 8    never imagine we would be standing here today, ever.
 9              And I would like to send my deepest felt
10    condolences to Alyssa's family and friends.  We
11    think about her and Willow every day.  And it's just
12    beyond our imagination that we would be here today,
13    because this is not the Andrew Beard that we know
14    and love.
15              THE COURT:  Thank you so much.
16              MR. RALEY:  Thank you.
17              THE COURT:  Call your next witness,
18    please.
19              MR. GRAY:  Your Honor, at this time we
20    would have Mr. Beard give his allocution.
21              THE COURT:  Okay.  Mr. Beard, come on up.
22              THE DEFENDANT:  Obviously, my name is
23    Andrew Beard.  Before I get into the allocution, I
24    would like to address a couple of things for
25    clarification --
```

```
 1              THE COURT:  Uh-huh.
 2              THE DEFENDANT:  -- after we've gone back
 3   and forth now under seal.
 4              THE COURT:  This is not anything under
 5   seal, because if it is, we will talk about it --
 6              THE DEFENDANT:  No, Your Honor, it's not
 7   under seal.  Thank you very much for clarifying
 8   that.
 9              The wood shard that was mentioned while we
10   were over there, which I don't think it matters that
11   it is under seal, there was an attempt to notice
12   this Court anonymously.  The jail does not allow you
13   to do that.  So unfortunately it was raised, and I
14   was brought into this facility to give information.
15              The information that I had received on
16   that was not information I could share identity on,
17   due to the man's safety, and he specifically asked
18   me that.  It's actually a gentleman you are familiar
19   with in this court.
20              After that was said and done, that was the
21   one thing I omitted to the government when they
22   interviewed me about that shard.
23              THE COURT:  Which was what?
24              THE DEFENDANT:  A wooden shard that I was
25   told was a shank.
```

```
 1              THE COURT:  Oh, yeah.
 2              THE DEFENDANT:  Okay.  Afterwards, when I
 3    returned to the facility, I told the gentleman the
 4    accusations, that I had done something with that.
 5    And he felt horrible that he had put me in that
 6    position.
 7              Since then, he has given a letter to
 8    address the Court if he wants, it doesn't matter at
 9    this point, but that is the only clarification I
10    wanted to give that.
11              As I, in multiple attempts and multiple
12    interviews said, I wanted absolutely nothing to do
13    with it, nor did I want Your Honor to even have
14    knowledge of my involvement with that.  It was an
15    attempt to just have it removed.  That is it.
16              THE COURT:  Okay.
17              THE DEFENDANT:  Second is clarification of
18    a civil suit.  There was a civil suit from the
19    family against me for these actions.  It was
20    dismissed for want of prosecution.
21              A second suit was then filed against me
22    and my former employer.  Just as I have done in this
23    criminal proceeding, I want to make sure that the
24    Court and also the family still know I am willing to
25    assist however I can because I am now indigent.  The
```

```
 1   employer has no culpability in this, but other
 2   things might help this family in order to gain what
 3   they need and deserve through a civil proceeding as
 4   well.  So those were the two clarifi-  --
 5              THE COURT:  Your family or their family?
 6              THE DEFENDANT:  Their family.
 7              THE COURT:  Okay.  Okay.
 8              THE DEFENDANT:  The Burkett family, the
 9   Forsyths and my daughter and trust with them.
10              That is it for the clarifications I had
11   before the allocution.
12              THE COURT:  Okay.
13              THE DEFENDANT:  Your Honor, it's very
14   clear, as you know the facts of this case, that we
15   are going to hear some pretty horrific words about
16   me:  Unsympathetic; gruesome; evil; murderer.
17              Little did I know three years ago that
18   could ever apply to me.  But we don't live in 2020,
19   we live in now.  And the now is where an
20   unforgivable crime must be accounted for.
21              A good friend of mine once told me, "God
22   forgives if you ask."  But I'm not here to plead for
23   forgiveness, because unforgivable crimes against the
24   laws of God, the laws of nature and the laws of man
25   are just that, unforgivable.  To seek forgiveness
```

1    now would be a farce to the families here today and

2    to the resentment I hold in my heart for myself.

3              I was once considered a good man, but now

4    I am less than a man, just the broken hollow vessel

5    filled with regret and shame.

6              THE COURT:  I mean, what caused you to do

7    this?

8              THE DEFENDANT:  What?

9              THE COURT:  What caused you to do this?

10             THE DEFENDANT:  I will go into that, Your

11   Honor.

12             THE COURT:  All right.

13             THE DEFENDANT:  As such, I will keep these

14   words brief to address what caused me to do this and

15   why a devastating, senseless act occurred.

16             But first, my unbelievably strong mother

17   in the room, who has provided me with so much love,

18   compassion and kindness, if only I had just shared

19   that with the Burkett family as you had, we would

20   not be here.  I violated every single aspect of my

21   upbringing by my mother.

22             To my steadfast uncle who you just met, I

23   revered you as a father.  You taught me about

24   strength, honor and how to be a man.  That is why it

25   pains me so to acknowledge I could never look you in

```
 1   the eyes again without knowing I have no strength, I
 2   have no honor, I am no longer the man you taught me
 3   to be.  The disappointment I have become can never
 4   be mended.
 5           To the remaining friends and family who
 6   braved to be here, and even those who are rightfully
 7   too ashamed of me to come, I wish being a part of my
 8   life didn't bring you the sadness and dishonor as it
 9   does today.  So many of you have stood by me
10   faithfully.  And even after hearing the news about
11   my horrific actions, you still stood by me.  I don't
12   deserve to call you my family or my friends.  I love
13   you all so much.
14           More importantly, to the Burkett family
15   and friends.  No parent should know how it fills to
16   have a child taken.  The void I have in my own heart
17   for me losing my own daughter for my own actions
18   pails in comparison to the unnatural, unnatural
19   emptiness I have caused by taking yours.  Words
20   cannot describe how truly sorry I am and -- and
21   what -- why did we do any of this?  Why did I do any
22   of this?
23           THE COURT:  Why?  Why?
24           THE DEFENDANT:  For more time with one
25   parent or another?  Stupid family squabbles or my
```

 1    ill-placed fear for my child's upbringing, which was

 2    illogical, or someone else's desire to control our

 3    family dynamic.

 4              None of these things can put in

 5    perspective the ungodly outcome that transpired.

 6    You deserved better as a family.  Your daughter, my

 7    daughter deserved better.

 8              Your family should have been shown the

 9    good man and strong father my family had raised, not

10    the monster you received, and for that I am forever

11    penitent and regretful.

12              I constantly wonder how things could have

13    been if I just stuck to my core beliefs and the

14    coparenting plan we all settled on three years ago.

15    Instead, I abandoned all of it to satisfy someone

16    else's greed and lust and my own.

17              THE COURT:  What about your own?  All

18    right.

19              THE DEFENDANT:  My own.

20              THE COURT:  Because this was not all. . .

21              THE DEFENDANT:  No, ma'am.  And like a

22    coward and because of my cowardice, everyone has

23    suffered horribly.  I should have said no.  I should

24    have stopped.  I should have realized that this was

25    a terrible mistake.  Any normal person would have.

A real man would have said no.  A real man would

have stopped.  Everything would then be different.

         To Willow, my little pumpkin butt.  A

father is supposed to protect, not to destroy; to

love, not to spite; and to provide, not to take.

Yet, in a grotesquely, misguided attempt to protect

your world from no actual harm, I destroyed any

normalcy to it.  I let my overwhelming love for you

be used and twisted into an unrealistic spite

towards your mother and her family that didn't even

exist.  And instead of providing all that you needed

in life, I took away the very thing that made it a

life, a loving mother, and even though stupid, a

loving father.

         Willow, your very name, your very name is

what it should have been.  Your mother let you have

my last name.  She didn't have to.  She has a middle

name that is a family name.  And we, as a parent, as

a team, picked your first name.  And yet, I still

threw away that plan for no reason.

         Hun, even though I can't tell you this in

person, nor will I ever get to see your sweet little

face again or hear your adorable little voice,

please know you deserved way more from me.  And even

more importantly, you deserved a full life with your

```
 1    mother, not to have that be decided by your father.
 2    I will forever miss you and forever love you with
 3    every inch of what's left in my soul.
 4            As I already mentioned, I have no right to
 5    ask anyone for anything I don't deserve.  But I do
 6    beg of each family member here today, for Willow's
 7    sake, to put aside the differences and work together
 8    as a team, as I should have and as I failed to do,
 9    to at least help this young girl's life be the best
10    it can be.
11            A wise woman once told me, "It takes a
12    village to raise a child."  I lost that somewhere
13    along the way.  Please don't do the same.  Please
14    don't fall into the same spiteful all-or-nothing
15    mentality I did.  It leads to pain, sorrow and
16    madness.
17            There are so many amazing lives and
18    wholesome people who want to provide nothing but
19    love and support for this little girl.  Please let
20    them in, and they will show you that even though I
21    turned out to be as evil and twisted as I have, they
22    did not.  They will support you.  They will help you
23    to the best of their abilities.
24            I cannot be sorry enough for bringing such
25    destruction and evilness to the lives of so many
```

```
1   people, including the young mother like Alyssa Ann
2   Burkett.
3           THE COURT:  I have a question.
4           THE DEFENDANT:  Yes, ma'am.
5           THE COURT:  When you shot her and then ran
6   up to stab her, was that to put her out of her pain
7   or because you wanted her dead?
8           THE DEFENDANT:  No, ma'am.
9           THE COURT:  Tell me the truth.
10          THE DEFENDANT:  The truth was, I was
11  horrifically broken.
12          THE COURT:  Okay.
13          THE DEFENDANT:  I was broken, and I wanted
14  the madness to stop.  I wanted the chaos to stop.  I
15  wanted a normal life to begin.
16          THE COURT:  All right.  But you wanted her
17  dead, right?
18          THE DEFENDANT:  No, it was -- it was I
19  caused this woman pain.  I heard pain.
20          THE COURT:  Okay.
21          THE DEFENDANT:  And also the evilness
22  inside of me, yes, wanted her dead.
23          THE COURT:  Okay.
24          THE DEFENDANT:  It is twofold, Your Honor.
25          THE COURT:  All right.
```

```
 1              THE DEFENDANT:  Twofold.
 2              THE COURT:  All right.
 3              THE DEFENDANT:  And to say otherwise would
 4   be, again, a farce.
 5              THE COURT:  All right.  All right.
 6              THE DEFENDANT:  I hope that this tragic
 7   story is an example to all other people out there
 8   who struggle with difficult family matters.  Life
 9   should be not be a Hatfield and McCoy TV drama.
10   Vengefulness, violence and the removal of any parent
11   from a child's life is never the answer.
12              THE COURT:  Well, I don't think we need to
13   talk about that.
14              THE DEFENDANT:  No, no, no.  And again, I
15   will end that.  Despite these motions, despite what
16   you've heard, despite what you've read, I am
17   100,000 percent responsible for these evil and
18   heinous actions.  And I do not believe at all that
19   you could look back on this crime and think that it
20   wasn't what you just asked me, was it because you
21   wanted someone to perish or was it because you were
22   completely feeling sorry for someone in pain.  It
23   can be both, but it does not negate the fact that I
24   did what I did.
25              THE COURT:  Thank you very much.
```

```
1               Mr. Gray?
2               MR. GRAY:  Your Honor, that's all we have
3     at this moment.
4               THE COURT:  Do you have something to say,
5     yourself?
6               MR. GRAY:  I do.
7               THE COURT:  Okay.  Have Mr. Beard sit
8     down.
9               Mr. Gray, go ahead.
10              MR. GRAY:  And I think we have heard
11    through Mr. Beard -- and you've read the motions,
12    the briefing -- this is a tragedy.
13              THE COURT:  It is a tragedy.
14              MR. GRAY:  It's horrible.
15              THE COURT:  It's a tragedy.
16              MR. GRAY:  And I will tell you from
17    meeting with Mr. Beard and with my co-counsel
18    meeting with Mr. Beard, we've all been doing this
19    for quite some time.
20              THE COURT:  Yeah.
21              MR. GRAY:  And he's not the person that I
22    would typically sit across the table from.
23              THE COURT:  I know.
24              MR. GRAY:  And that is -- that is one of
25    the things -- that doesn't make anything any better
```

1   here, but it is also one of -- one of the tragedies

2   in all of this.

3         We've been through the evidence.  We've --

4   we've had many communications.  I truly believe if

5   it wasn't for some of the facts that you have read

6   in the 5K, we wouldn't be having this hearing.  But

7   that doesn't excuse anything at all, and Mr. Beard

8   is not using that as an excuse.

9         THE COURT:  Yeah, I don't think he can.  I

10  mean --

11        MR. GRAY:  He's certainly not, and I don't

12  think anybody is.

13        THE COURT:  Yeah, he can't use that.

14        MR. GRAY:  And no one is trying to.  But I

15  will say this.  He has come forward.  He has

16  admitted his guilt.  He has spent -- let's just say

17  he has admitted his guilt.

18        THE COURT:  Yeah.

19        MR. GRAY:  And so you have the guidelines

20  that the Court must consider.  And where I have it,

21  where the Court mentioned it based on the rulings

22  that you've made today, is a level 41.  And then the

23  10 statutory minimum for the third count.  And based

24  on Mr. Beard admitting his guilt, basically you've

25  seen the 5K, the bottom range of that range is 360

```
 1   months.  I believe it's 360 to 405.
 2              THE COURT:  324 to 405, yeah.
 3              MR. GRAY:  Which is where that is.
 4              Now, if you look at the statistics -- and
 5   let me preface what I'm going to say with, there is
 6   no average murder.  There's not.
 7              THE COURT:  No.  I agree.
 8              MR. GRAY:  And statistics are statistics.
 9   And when you look at the 2020 statistics for
10   sentences on a murder charge, the national average
11   is 255.  From the 5th Circuit, the national average
12   was 275, I believe.
13              And so Mr. Beard finds himself in a
14   situation under these circumstances where he's
15   looking at a minimum 324.  Your Honor, I would ask
16   that you take that into consideration with regards
17   to the guidelines, the standards, everything that we
18   have here with the facts.  It's -- it's -- it's
19   tough.  We're asking that you sentence him within
20   that level, level 41, the 324 to 403.
21              THE COURT:  Thank you very much.
22              Who all is here for Mr. Beard?  Please
23   stand up.  Anybody here for Mr. Beard?
24              Thank you-all.  I just want to thank you
25   for coming down.  I know it's the hardest thing in
```

```
1    the world for you to come down here and see this.
2    And I know that you can't understand why he did
3    this, and I can't either.  But I'm really glad that
4    you came down for him.
5              Thank you very much.  Please be seated.
6              Okay.  Mr. Tromblay.
7              MR. TROMBLAY:  Yes, sir -- yes, ma'am.
8    The victim's grandfather, mother and a close friend
9    of hers are here to address the Court.
10             THE COURT:  Okay.  Have them come up.
11             MR. TROMBLAY:  Your Honor, may I come with
12   her to the lectern?
13             THE COURT:  Yes, absolutely.
14             And tell us your name.
15             MS. COLLARD:  Teresa Collard.
16             THE COURT:  Okay.  Go ahead, Ms. Collard.
17   Hold on a second.  Everyone that's here for Ms. --
18   for the victim, just -- excuse me, I'm forgetting
19   her name right now -- please stand up.  Okay.  I'm
20   glad you-all are here.  It's nice to see you.  I
21   know you are here because you loved her so much --
22   Alyssa -- and I'm glad you're here.  Thank you very
23   much.  Please be seated.
24             Go ahead.
25             MS. COLLARD:  I'm Teresa Collard, Alyssa
```

1    Ann Burkett's mother.

2              THE COURT:  Okay.

3              MS. COLLARD:  As he said, as a parent, you

4    do want to protect your child.  I think every day,

5    what could I have done differently leading up to the

6    day she was taken from us.

7              We have suffered over a year dealing with

8    this murderer that sits among us today.  This was no

9    fast decision he made.  This was longtime planning

10   and coming.

11             Alyssa was smart and beautiful with a

12   bright future ahead of her.  She was so determined

13   to be successful and be able to provide a great life

14   for her and Willow.  She was a single mother, a

15   college student and worked full time to support her

16   and Willow.

17             I can't put into words how much this

18   impacted our family or how it has affected every

19   aspect of our lives every single day.  There are no

20   words to describe my feelings on how incredibly much

21   I miss her.

22             The last conversation that I had with her

23   was the night before, on October 1st, 2020.  She had

24   just met the murderer to exchange Willow.  And she

25   had to call me to tell me how heartbroken she was

1    because Willow had cried so bad because she had to

2    go with him.  This is something Willow did every

3    time I witnessed him picking her up.  I feel like

4    her intuition was spot on as a baby.

5            He met her for Willow that evening,

6    knowing he was planning her death the very next

7    morning.  I'm hoping that Willow will never have to

8    fear him again, but it breaks my heart that that's

9    the last time my daughter saw her.

10           Alyssa really enjoyed her new role as a

11   mother.  She made so many life changes becoming a

12   mother, changes for the better.  I witnessed the

13   bond that she and Willow shared.  I remember at

14   times when I would be watching Willow while Alyssa

15   was at work.  Alyssa would walk in, and Willow knew

16   the sounds of her heels hitting the floor, and she

17   knew eventually Alyssa would be in sight, and she

18   got so excited.  Those were the moments my heart was

19   so happy, to watch my daughter and granddaughter

20   have a bond that way.

21           Alyssa also suffered so much during that

22   year with working full time, attending school, being

23   a new mom.  She had to deal with this narcissist who

24   thought he was so much better than her.  Murderer.

25   This also included ongoing court battles; lies

43

```
1   continuously told about her as a mother; her baby
2   kept from her; drugs and guns being planted in her
3   vehicle; the constant feeling that you're being
4   watched or followed, and you can't do anything about
5   it.
6               This killer stalked, planned and tracked
7   another human being like she was an animal.
8               (CSO admonishing person in the gallery.)
9               THE COURT:  Okay.  Go ahead.  Sorry.
10              MS. COLLARD:  I do not believe that there
11  is any way to express the amount of fear she had
12  every single day; afraid to go to sleep in her own
13  home.  All of this brought on the added stress.
14              She had high blood pressure and anxiety
15  that you can't even imagine.  There were many times
16  that she told me, "Mom, I think he is the type to
17  kill me."  And I would just be like, "Alyssa, that's
18  a crazy thought."  But her intuitions were spot on,
19  as well.
20              This all led up to the unfathomable day
21  where an act of evil devastated our family.  It was
22  the morning of October 2nd.  It was a normal Friday
23  morning that started like any other day.
24              I had a doctor's appointment that morning.
25  And close to the end of my appointment, my phone
```

44

1    started ringing nonstop.  It was people I work with,

2    which I thought was weird because they knew where I

3    was.

4            As I was leaving, I answered the call from

5    my boss telling me to get to Greentree Apartments as

6    soon as I could, that something had happened to

7    Alyssa.  I could tell she was hesitant to tell me

8    any more, but I was very persistent.  She finally

9    uttered the words, Alyssa had been shot.  I got in

10   my car and went straight there.  Alyssa worked with

11   the same company as I did, and that's the property

12   that we managed.

13           I started thinking of all the worst

14   things, as any parent would, that her worst fear had

15   become true.  I knew immediately he was guilty, and

16   there wasn't a doubt in my mind.

17           The days, weeks, months and now years have

18   been exhausting, to say the least.  The thoughts of

19   what happened to her consumed me daily for quite a

20   while, and sometimes still do.  We live in fear of

21   our own lives.  We uprooted our family and moved out

22   of our home to feel safer.  He even had the audacity

23   to convince people in his family that I had

24   something to do with my own daughter's death.  So

25   arrogant.  This has affected every one of us in

```
 1   different ways.

 2            Alyssa was a daughter, a sister, a cousin,

 3   a granddaughter, a niece and a coworker, and a

 4   friend to so many that are here today.  But most

 5   importantly, she was a mother to Willow.  As a

 6   family, we will never know what all she could have

 7   accomplished in life.  We are only left with the

 8   memories and all the what-ifs.  We feel it every

 9   single day of our lives, the void of her absence,

10   all the milestones Willow has already ahead of her.

11   We are the ones getting to watch her grow.  I can't

12   stand the fact that her mother never gets to see

13   this or share all her special moments, all the other

14   milestones in life that she will not get to be a

15   part of.  Willow is ultimately the one hurt the very

16   most in this tragedy.

17            And then there are also things like her

18   younger sister, Madison.  She's due to have her own

19   baby soon.  This baby will never know Alyssa.

20            Her little brother who is here, he's 12

21   today, so he was 10 when this happened.  Her little

22   brother, he was her favorite person until Willow

23   came along.  She was his biggest fan, attended all

24   his sporting games.

25            How do you convince your kids that God
```

1   will protect us and save us when they ask why he

2   didn't protect and save Alyssa?  I now have the

3   responsibility to raise Willow.  Although I am so

4   blessed to have her, she should be raised by her own

5   mother.

6          Willow has been a saving grace to me and

7   has given me more than I can ever give her, and she

8   doesn't even know it.  She truly reminds me of her

9   mother every time I look at her.  I grieve for all

10  the things Willow will miss.  I grieve knowing that

11  one day Willow will have to face the facts and

12  reality of this trauma, and we will live through it

13  all over again.

14          I grieve that Willow had the least amount

15  of time with her mother than the rest of us.

16  Everyone knows how important a mother is, and she

17  should still have hers.  The fear, anxiety and

18  stress I still have to this day hasn't gone away.  I

19  am still dealing with this today, as I am here for

20  her justice.  I'm still dealing with court

21  litigations over Willow and Andrew's mother,

22  Lizette, taking place with the same routine filings

23  over and over.

24          THE COURT:  What do you mean?

25          MS. COLLARD:  She's constantly filing

47

```
1    something in the child custody case.
2              THE COURT:  Who is?
3              MS. COLLARD:  Lizette, his mother.
4              THE COURT:  His mother --
5              MS. COLLARD:  Mm-hmm.
6              THE COURT:  -- is filing stuff in the
7    child custody case?
8              MS. COLLARD:  Mm-hmm.
9              THE COURT:  Why?
10             MS. COLLARD:  Well, she wants to have
11   Willow.  So at first she wanted custody of Willow.
12             THE COURT:  And she's filing stuff now?
13             MS. COLLARD:  Still.  Yeah, now she's
14   asked for a jury trial of the latest, which we had
15   to pay another $15,000 to our attorney just within
16   the last week.
17             THE COURT:  All right.  All right.
18             MS. COLLARD:  We have spent thousands and
19   thousands of dollars in attorney's fees since this
20   all began with Willow.  First, we had to pay it for
21   Alyssa, because, remember, she's a college student,
22   single mom.  Now we are over two years in our own
23   battle with the murderer's mother, Lizette.
24             I have numerous sleepless nights.  And
25   every time I see a black Ford Expedition, I wonder
```

```
 1    if a murderer is driving it.
 2            THE COURT:  Who are you talking about now?
 3    Lizette?
 4            MS. COLLARD:  No.  I'm just -- the Ford
 5    Expedition is what he drove the morning of --
 6            THE COURT:  Oh, I gotcha.
 7            MS. COLLARD:  -- that he went to go do the
 8    murder.  So just every time I see one, that brings
 9    me back to that morning.
10            I just think of how we must have passed
11    each other on the highway that morning while he was
12    escaping to go home and I was on my way to her aid.
13            Her life was brutally taken from her for
14    absolutely no reason at all.  And then her fear came
15    true in the worst way possible.  How someone can do
16    that to another human being, how someone can do that
17    to their own child's mother, I will never
18    understand, no matter the circumstances.
19            She was left there to die, bleeding out
20    from all 13 stab wounds and a shot to the head like
21    she was nothing, like she was garbage.  And she was
22    so much more, and especially to Willow.  There isn't
23    a father I've ever known that would do that to their
24    child.  And he is definitely right, he is not a man.
25            I want to thank everyone who has put in
```

1    countless hours on this case.  I thank all the
2    police, the detectives, the U.S. Attorneys, Judge
3    Boyle, the FBI, Pam -- so many others that I
4    probably don't even have a clue about -- in getting
5    justice for Alyssa.
6            I also want to thank Maria.  She was a
7    coworker that Alyssa had in her office and first out
8    to her aid.  I know she tried hard that morning to
9    do all she could.  She told me about the experience
10   of Alyssa gasping for her last breath and she
11   thought she was gone, and then a few seconds later
12   she came back and started breathing again, and then
13   she was gone.  I thank you for being there and
14   holding her in the end as she took those last few
15   breaths so she wasn't alone.  I felt the guilt that
16   I wasn't there to help her.
17            Sorry.
18            I never did think I would have something
19   in common with a monster that took my daughter's
20   life, but I do, unfortunately.  Neither of us will
21   ever physically see our daughters again in this
22   lifetime.
23            Andrew, I have lots of hateful things that
24   I would like to say to you.  But out of respect for
25   myself and everyone in this courtroom, I am not here

1    to do that today.  That's called being the better,

2    bigger person and something that I know you know

3    nothing about it.

4              THE COURT:  Okay.  Would you wrap it up,

5    please?

6              MS. COLLARD:  Alyssa fought for her life.

7    And all I can imagine is that she knew it was you

8    and the fear she had of her life flashing before her

9    eyes and her never seeing Willow again.  You were

10   evil.  You overpowered and took her life.

11             Judge, I ask you today to use your power

12   and what is justice for Alyssa, allow him to feel

13   those last moments of what she felt.  I want him to

14   suffer every single moment of every single day that

15   he rots in prison.  I pray that he never sees the

16   light of day and that he's buried for the eternity

17   of darkness, the same as my daughter.

18             Thank you.

19             THE COURT:  Thank you very much.

20             MR. TROMBLAY:  And Judge, Mr. Russell

21   Forsyth, the victim's grandfather would --

22             THE COURT:  Okay.  Come on up.

23             State your name for the record.

24             MR. FORSYTH:  My name is Russell Forsyth.

25             THE COURT:  Russell Forsyth.  Okay.  Be

1    sure to speak into the microphone.  Go ahead.

2              MR. FORSYTH:  Okay.  I am Allysa's

3    grandfather, and I want to thank you for letting me

4    speak today and also for reading my formal impact

5    statement.

6              THE COURT:  I did.  I did.

7              MR. FORSYTH:  I understand that.

8              I'm going to have to amend some of the

9    things I want to say to you today because of what's

10   already happened in the courtroom.  And I will try

11   and do that as best I can.

12             THE COURT:  Please keep it short if you

13   can.

14             MR. FORSYTH:  Okay.

15             THE COURT:  But I want you to say your

16   piece.

17             MR. FORSYTH:  Okay.  So you didn't have a

18   chance to know Alyssa from the perspective outside

19   this crime.

20             THE COURT:  People, people, back there,

21   back there.  You can't be talking back and forth.

22             Okay.

23             MR. FORSYTH:  Alyssa was always a

24   high-spirited child.  Her passionate nature and

25   fierce dedication to her thoughts and beliefs made

1   her a remarkable individual, even at a young age.

2   She was bright, she was creative, and she was

3   engaging.  She was strong-willed, determined and

4   opinionated and stubborn.

5           THE COURT:  Hold on.  Are we going to talk

6   or go out?

7           Okay.  Okay.  Go ahead.

8           MR. FORSYTH:  It's not surprising she had

9   all these traits, as they fell on both sides of the

10  family tree, but it was often these traits that made

11  her the most endearing.

12          She was transparent.  What you saw is what

13  you got.  She was -- did things that would make you

14  angry, but you couldn't really stay mad at her,

15  because she was goofy and sometimes forthright and

16  fun-loving and curious.  She had a million-dollar

17  smile and a heart of gold.

18          As she grew into a young woman, she had

19  the same problems that a lot of other young women

20  have, you know, that people face today.  She had

21  insecurities.  She struggled with lack of purpose

22  and direction.  And when she found out she was

23  pregnant in 2018, it became clear that her

24  relationship was not going to be one that endured

25  the difficult task of raising a child.  So she faced

1    that heartbreaking reality, that she would be going

2    through the pregnancy and having the responsibility

3    of raising a child on her own.  But there was

4    nothing to choose for her, she embraced the role as

5    a mother.

6              And when Willow was born, my wife and I,

7    she told me -- my wife, Becky, told me, "I'm not

8    going to miss another generation.  We're moving."

9    So we left our home of 40 years and came to this

10   area in May of 2020.  And as you know by the

11   timeline, things were starting to heat up a lot

12   right then.

13             But my point is, Alyssa was an influencer.

14   She had many. . .

15             MR. TROMBLAY:  Mr. Forsyth, why don't you

16   address to the Court the impact that this crime --

17             MR. FORSYTH:  Okay.  I will get to that,

18   yes.  Thank you.

19             THE COURT:  The restitution and financial

20   considerations I'm interested in.

21             MR. FORSYTH:  Okay.  So Alyssa was living

22   her dream at the time to be a lawyer, and she was

23   doing well enough with that dream.  But she was also

24   fighting for another dream, and that was her dream

25   to have a home for Willow.  She wanted a home that

1    she would go to the same school for all her life,

2    live in the same neighborhood for all her life, and

3    that's what she was working toward when she was

4    murdered.

5            And of course you know some of the -- you

6    know the details of all this case.  But when the

7    evidence was planted in the vehicle, that's when I

8    started getting involved with authorities and was

9    having conversations with Sergeant Losack of the

10   Carrollton Police Department and telling him how

11   concerned I was that this, to me, was a moving train

12   wreck, and we can see it all coming.

13           And it was in these conversations I told

14   him, "This is -- Andrew Beard is not going to stop."

15           And he said, "Why would you say that?"

16           I said, "Because he's arrogant, and he

17   thinks he can get away with it."

18           And that arrogance is woven into the

19   fabric of his own narcissism, and all of us felt the

20   same way.  So seeing that this was coming at us the

21   way it was, Alyssa saying, "He's going to kill us,"

22   you know -- I mean, it was -- the residue of that

23   is, we all are going to carry that burden with us

24   the rest of our lives to our graves.  Why couldn't

25   we stop this?  Why did this happen?  What could we

55

 1  have done differently to prevent such a tragedy?

 2         From the darkest corner of my room, the

 3  guttural sounds that express my deepest feelings of

 4  my loss might give you a better sense of the

 5  profound tragedy that occurred here, more so than

 6  any words that I could ever say.

 7         But my point is that, for a lot of us,

 8  there is no foreseeable path of peace for our

 9  future.  If she had died in an accident or of an

10  illness or of natural causes, of course it would be

11  different for us.  But the nature of -- of this

12  murder and what happened, you know, it is an

13  abomination.

14         So no one can face her death for me alone.

15  And as you know, and what I messaged to you before,

16  what Andrew Beard did is, he put us on an island.  I

17  am on my island.  And on that island are several

18  others:  Teresa, her mother; Becky, her grandmother;

19  Josh, her father; Renda, her grandmother; Chad, her

20  stepfather; Landon, her brother; Madison, Taylor,

21  her sisters; my wife, Becky; her boyfriend, Ben.

22  Every member of our family has their own island.

23  And we are surrounded on that island by an ocean of

24  isolation of despair of our own personal

25  relationship with her and what it means for that

1    loss.

2         But as you know, then there is Willow.

3    And this consternation is now a part of her history

4    and something she will face forever.  Andrew Beard

5    has stained the roots of his family and ours for

6    eternity with Alyssa's blood.  The word

7    "premeditated" somehow doesn't rise to the level

8    that would accurately describe his plans and actions

9    in his crimes.

10        Willow's father brutally murdered her

11   mother, which is the story that she will come to

12   know as she grows older.  His abhorrent deeds will

13   be a continuous psychological disturbance for her.

14   And that is beyond any of our grasp in this

15   courtroom today what that's going to be like for

16   her.

17        So it is safe to assume that the most

18   horrible consequence of his action is something that

19   no human should ever have to face.  And never was

20   Alyssa's warrior spirit more on display than in the

21   final moments of her life.

22        Make no mistake, we're never going to get

23   over it.  We're never going to, you know, get past

24   it.  All of our friends and family are tasked with

25   learning to live in a world without her, to keep her

1  alive in our hearts, to keep her in our memories,

2  and to search for her in our dreams.

3          Restitution.  In my formal statement, I

4  itemized a financial list in attempt to give a

5  dollar value to restitution.  The truth is, no

6  amount of money will ever compensate our family for

7  the life that was taken.

8          Once again, I am asking the Court for the

9  maximum amount allowed by law to be ordered to

10  repay -- for repayment by Andrew Beard.  I firmly

11  believe that child support was a big part of the

12  motivation for her murder and that he did not want

13  to pay her directly, which there's still indications

14  of that.

15          But it is my understanding that Andrew

16  Beard had a conceptual framework around child

17  support that was established during his childhood.

18  So, to me, it's only fair that this financial

19  obligation to his daughter is considered beyond any

20  confines normally associated with restitution.

21          Alyssa gave her life for her daughter.

22  Not only would it represent a disservice, it would

23  dishonor her memory and this obligation to be

24  suspended in any form for any reason.

25          It is my understanding that a person in

58

1  prison rarely gets ordered restitution.  And in this
2  case, restitution is more than a court order that
3  will or will not be paid.  It represents a statement
4  from our society regarding a moral obligation that
5  Andrew has to his daughter.  No amount could
6  possibly exceed a total considered fair in my
7  opinion.  Simply because he was caught and serving
8  time as giving up his rights to his daughter, he can
9  never step away from the responsibility that is his
10 daughter.
11         It is the necessary statement that should
12 serve as a warning to those who would go to the same
13 extremes as Andrew Beard.  Court-ordered restitution
14 is another way of saying, "Alyssa's life and
15 Willow's life mattered."  Andrew Beard must honor
16 this obligation in order to speak to a moral
17 consequence.
18         Judge Boyle, I respectfully request the
19 maximum amount of restitution possible under federal
20 law.  Along with any amount imposed by the Court,
21 I'm asking that Andrew Beard be ordered to begin
22 repaying restitution by mandatory participation in
23 the Inmate Financial Responsibility Program.  But to
24 be clear, no amount of restitution could ever match
25 the heavy emotional toll that we've taken.

1              Sentencing.  There are three things that

2    come up with him regarding sentencing.  One is that

3    up until today, I didn't see any remorse ever from

4    Andrew Beard.  He has changed that today.  He has

5    never apologized to our family until today, once

6    again.  At the time, confessing seemed more akin to

7    self-preservation than any form of reconciliation in

8    regard to restorative justice.

9              Second is the extreme racism projected by

10   Beard to supplant and misdirect blame toward a

11   person of color.  This demonstrates a mindset, this

12   condition, to a sense of superiority and

13   entitlement.  Imagine if his black-face scheme had

14   worked and an innocent person had been blamed for

15   this murder.  It's hard to conceive in any reality

16   where time in prison would change his extremist

17   attitudes and terroristic inclinations when viewing

18   the actions of Mr. Andrew Beard.

19             The third is the horror of the crimes he

20   committed.  This type of unprovoked attack with such

21   extreme levels of violence following a significant

22   level of planning places Andrew Beard as someone who

23   poses the highest level of threat to our society.

24   It is nothing short of measured psychopathy.

25             The nature of the crime, itself, is

```
 1  deserving of a lifetime behind bars.  I respectfully

 2  ask the Court for maximum sentencing for each

 3  offense to run consecutively to ensure that Andrew

 4  Beard never breathes the air of freedom outside of

 5  federal captivity.

 6          To be clear, my request is not seeking

 7  vengeance.  I'm asking the Court for a penalty equal

 8  to the scope of his actions.  If anyone deserves to

 9  be placed on their island for life, it is Andrew

10  Beard.  He should suffer a similar fate of that

11  which he has imposed on so many others, not the

12  least of which, his own daughter.

13          Thank you.

14          THE COURT:  Thank you so much.

15          And Mr. Tromblay, would you give me the

16  specifics of that restitution?

17          MR. TROMBLAY:  Yes, ma'am.  I believe they

18  are --

19          THE COURT:  I mean, I have the specifics

20  right up here, but I would like you to say it so

21  that it's on the record.

22          MR. TROMBLAY:  Yes, ma'am.

23          THE COURT:  I have the -- if you need it.

24  Okay.

25          MR. TROMBLAY:  That's fine.  I have it,
```

1    Your Honor.

2           Your Honor, Probation has determined that

3    the amount of restitution, the total amount in this

4    case --

5           THE COURT:  Did you decide it?

6           MR. TROMBLAY:  I thought I had.

7           THE COURT:  Do you have it, Mister --

8           USPO:  Your Honor, the restitution in the

9    presentence report is $1,071,649.84.

10          THE COURT:  Okay.

11          MR. TROMBLAY:  That is correct, Your

12   Honor.  That's what I understand it to be.

13          THE COURT:  Okay.  And I do find -- I'm

14   looking at the -- and I'm going to make this part of

15   the record from Russell Forsyth, because I think the

16   breakdown of it is important.

17          Her vehicle, $5,000 and all that stuff.  I

18   want to make that part of the record.  But I do find

19   it's fair and reasonable under the circumstances and

20   supported by what Mr. Forsyth just said.  So I want

21   to make sure that's clear.  Okay?

22          MR. TROMBLAY:  Yes, Your Honor.  The exact

23   numbers are in Paragraph 36 of the presentence

24   report.

25          And it breaks down as follows, for a total

1    amount, as the probation officer just reported,

2    $1,071,649.84.

3              THE COURT:  Okay.

4              MR. TROMBLAY:  The largest portion of

5    that, of course, is going to be the lost wages from

6    the victim, which total an amount of $1,055,349.84.

7              There's also the cost of the victim's

8    funeral and headstone that are incorporated in that.

9              So we would ask the Court to impose

10   restitution in the amount of $1,071,649.84.

11             THE COURT:  I will.  All right.

12             Mr. Tromblay, go ahead.  What do you have

13   to say?

14             MR. TROMBLAY:  Your Honor, this crime that

15   was committed is as cowardly as it was savage.

16             THE COURT:  Yeah.

17             MR. TROMBLAY:  Obviously the Court is well

18   aware of its responsibilities, in imposing sentence,

19   the factors under 3553(a).  The ones that stick out

20   to the government are as follows:  The nature and

21   circumstances of the offense; the seriousness of the

22   offense; to promote respect for the law; and also,

23   more importantly, to provide just punishment for

24   that crime.

25             At this time, Your Honor, we would ask the

1    Court, and we would offer for purposes of

2    sentencing, Government's Exhibits 1 through 5, which

3    we have provided to the Court.

4              THE COURT:  Any objection?

5              MR. GRAY:  Your Honor, we have no

6    objection to Exhibit 1.  Exhibits 2 through 5, those

7    represent facts that have already been presented

8    through the PSR and other sources that the Court

9    has, and we're objecting to relevance on those.

10             THE COURT:  Overruled.  1, 2, 3, 4 and 5

11   are admitted.

12      (GX 1 - 5 admitted into evidence **under SEAL**.)

13             MR. TROMBLAY:  Okay.  And we would ask

14   that because of the nature of those exhibits, that

15   they be kept under seal.

16             THE COURT:  Yeah, all right.

17             MR. TROMBLAY:  Your Honor, this was not an

18   offense that was committed in the heat of passion or

19   in the spur of the moment.

20             THE COURT:  No.

21             MR. TROMBLAY:  This was an offense that

22   took considerable planning.  In fact, there was a

23   months-long stalking campaign that Andrew Beard

24   facilitated against an innocent victim, the mother

25   of a one-year-old child, his child.  It started off

1   with harassment, tracking devices placed on her car.

2   It culminated with the planting of evidence; not

3   just any evidence, but a gun and drugs --

4          THE COURT:  Uh-huh.

5          MR. TROMBLAY:  -- in order to paint her as

6   an armed drug dealer, which you know is a serious

7   offense; to try to get her arrested for a crime that

8   she didn't commit.

9          And when that didn't work, as the

10  presentence report lays out in detail, everything

11  was complete for Mr. Beard to purchase two vehicles,

12  one of which he abandoned, the other one he

13  ultimately used lying in wait with a dangerous

14  weapon.  In fact, he had two.  He had a knife, and

15  he also had a shotgun.

16         He waited, tracked the victim, tracked her

17  to where she worked.  And when she pulled up at

18  work, he came up behind her -- she was completely

19  not expecting what I'm about to describe -- shot her

20  in the head with a shotgun, and then he left -- he

21  was about to leave.  And then, whenever he realized

22  that she had staggered out of the car badly

23  wounded --

24         THE COURT:  Speak up.

25         MR. TROMBLAY:  -- badly wounded and

1   bloodied, screaming for help, this story about him

2   wanting to take her out of her misery and, you know,

3   he couldn't stand to see her suffer, that doesn't

4   pass the laugh test.  He wanted to kill her, and he

5   made good on it.

6          He then went, grabbed her from behind,

7   held her in place, and he plunged a knife 13 times

8   through her upper body.  You saw the pictures of

9   what he did to her.

10         In total, according to the autopsy report,

11  she sustained -- her body sustained 31 cuts.  This

12  wasn't just kill, it was overkill.  This was

13  harassment, planting of evidence, lying in wait with

14  a deadly weapon, and that culminated in a savage,

15  horrific murder that took away a child from a loving

16  mother.

17         Your Honor, we have given you all the

18  evidence for you to prepare and impose a just

19  punishment considering the good, the bad and the

20  ugly.  This is a horrific case.  We believe that

21  everything that you have before you is sufficient in

22  order for you to soundly exercise your discretion

23  and impose a sentence upon Andrew Beard that fits

24  perfectly with what he did, and we ask you to do

25  that.

```
 1              THE COURT:  Thank you very much,
 2   Mr. Tromblay.
 3              Mr. Beard, would you come up here with
 4   your attorney, please?
 5              Mr. Beard, you have all the letters.  And
 6   it was so nice of your family to come down here and
 7   your friends to come down here today.  But, you
 8   know, the circumstances of this offense are so
 9   offensive to everybody in this room.  And it's just
10   so amazing to me that this was not in the heat of
11   the moment.
12              You talked about murder cases and 255
13   being the general medium.  But I don't know how much
14   those involved planning and executing, because he
15   planned this, he executed this planning.
16              I mean, you tried to get her arrested for
17   drugs and guns.  When that didn't work out, I'm
18   surprised you didn't drop everything.
19              But -- and by the way, I think your
20   girlfriend, whatever she had to do with this, had
21   nothing to do with you undertaking this, nothing to
22   do with you undertaking this.  Alyssa Burkett died
23   that day because you planned and executed her -- her
24   demise, her sentencing, her death.  So many lies.
25   And most importantly, you had the whole family,
```

1    including her, in fear for all these months until

2    she finally experienced the ultimate.

3            You know, it's -- it's just unforgivable,

4    and I am sorry, it's unforgivable what you did.  It

5    was -- it's sick and all the other things that

6    people said.  It's racist.  It's all that.  But I

7    just can't understand how it could come out of a

8    person like you who has never been in trouble in

9    your life before.  But it was cowardly.  It was

10   planned.  And it was so, so awful.

11           So I am going to give you a sentence of

12   Count -- I mean, this is all the 3553 factors,

13   especially the ones Mr. Tromblay talked about.  Just

14   punishment is the most important one, but all of

15   them, the nature of the crime, the circumstances of

16   the crime and your carrying out of them.  And I do

17   think there's a bit of a lack of remorse.

18           I know you guys have done a great job with

19   him.  But when I watched you up there, you talked

20   mostly about yourself.  You talked a little bit

21   about -- I mean, you talked a lot about how sorry

22   you were and all that stuff, but you also talked a

23   lot about yourself.  I don't understand it.  I'm not

24   going to try to understand it.

25           But anyway, as to Count 2, I'm going to

```
1    give you 405 months on Count 2.  And on Count 3, 10

2    years to run consecutively to Count 2.  And so

3    that's going to be 525 months.  Right?  Am I right

4    about that?

5                    MR. TROMBLAY:  Yes, ma'am.

6                    THE COURT:  Yeah, 525 months.  Supervised

7    release on Count 3 and Count 2 is five years per

8    count.  It's a total of five years.  I'm going to

9    run them concurrently, Counts 2 and 3.

10                    No fine, no rest- -- no, restitution is in

11   the amount of $1,071,649.84.  And $100 per count

12   special assessment for a total of $200.

13                    Mr. Gray, have you been over the

14   pretrial -- the supervised release conditions with

15   him?

16                    MR. GRAY:  We have not been over the

17   supervised release conditions.

18                    THE COURT:  Okay.  Why don't you spend

19   some time going over them.

20                    (Pause.)

21                    THE COURT:  And I'm going to take a short

22   break.  Five minutes.

23                    (Recess taken.)

24                    THE COURT:  Mr. Beard, come on up here.  I

25   want to make sure that I said that the 120 months
```

```
1    runs consecutive to the 405.  I think I did, but I
2    want to make sure I did.  So it's 525.
3            Have you read over the conditions of
4    supervised release?
5            THE DEFENDANT:  Yes, ma'am.
6            THE COURT:  All of them?
7            THE DEFENDANT:  Yes, ma'am.
8            THE COURT:  The special conditions -- hold
9    on.  I want to make sure I've seen them.
10           MR. GRAY:  Your Honor, he reviewed the
11   entire PSR.  Those pretrial release conditions are
12   contained in the back of the PSR.
13           THE COURT:  Yeah, they're on yellow paper.
14           MR. GRAY:  Ours is not.
15           THE COURT:  Part G -- and it's G, the
16   special and the standard conditions.
17           THE DEFENDANT:  Yes, ma'am.
18           THE COURT:  Okay.  Okay.  Do you agree to
19   be bound by those conditions?
20           THE DEFENDANT:  Yes, ma'am.
21           THE COURT:  Did you sign the last page --
22   never mind, you don't sign it.
23           Okay.  Hold on a second.
24           Pursuant to the Sentencing Reform Act of
25   1984, it is the judgment of the Court that the
```

```
 1   defendant, Andrew Charles Beard, is hereby committed
 2   to the custody of the Federal Bureau of Prisons for
 3   a period of 525 months on Count 3 and Count 2.  The
 4   sentence shall run consecutively -- or concurrently
 5   to any -- any sentence imposed in Case Number
 6   F-20 -- no, consecutively -- no, concurrently -- any
 7   sentence imposed in case F-20122747 pending in the
 8   204th Judicial District Court of Dallas County, as
 9   this case is related to the federal offense.
10             Pursuant to the plea agreement, the
11   defendant is to forfeit the following:  A firearm
12   silencer, as defined in 18 United States
13   Code Section 921(a)(24) and further described as a
14   metal cylindrical device, measuring approximately
15   4-1/4 inches in overall length and approximately
16   1-5/8 inches at its major diameter; 2, bearing no
17   manufacturer markings or serial number; 3,
18   consisting of a front end-cap, one baffle, one
19   spacer, one rear end-cap, which are all fabricated
20   from aluminum; 4, the four stackable sections have
21   an internal and external thread that screw together
22   to assemble the device in the center hole, and three
23   of the stackable sections had been drilled off
24   center; and any firearm or an ammunition recovered
25   from this firearm silencer.
```

```
 1              Pursuant to the Mandatory Victims
 2    Restitution Act of 1996, the defendant is ordered to
 3    pay restitution in the amount of $1,071,649.84,
 4    payable to the U.S. District Clerk, 1100 Commerce,
 5    Room 1452, Dallas 75242.
 6              Restitution shall be paid immediately, and
 7    any unpaid balance shall be paid during
 8    incarceration.  Restitution shall be disbursed to
 9    Teresa Collard.  Her address is in Rest Assured.  If
10    upon commencement of the term of supervised release
11    any part of the restitution remains unpaid, the
12    defendant shall make payments on such unpaid balance
13    of monthly installments of not less than 10 percent
14    of the defendant's gross monthly income or at a rate
15    of not less than $150 per month, whichever is
16    greater.  Payment shall begin no later than 60 days
17    after the defendant's release from confinement and
18    shall continue each month thereafter until the
19    balance is paid in full.
20              In addition, at least 50 percent of the
21    receipts received from gifts, tax returns,
22    inheritances, bonuses, lawsuit awards and any other
23    receipt of money shall be paid toward the unpaid
24    balance within 15 days of receipt.
25              This payment plan shall not affect the
```

```
 1    ability of the U.S. to immediately collect in full
 2    through garnishment, the Treasury Offset Program,
 3    the Inmate Financial Responsibility Program, the
 4    Federal Debt Collection Procedures Act of 1990 or
 5    any other means available under federal or state
 6    law.
 7               Furthermore, it is ordered that interest
 8    on the unpaid balance is waived pursuant to
 9    18 United States Code Section 3612(f)(3).  No fine
10    is ordered.
11               Okay.  Now, you can appeal this sentence
12    if you want to.  If you want to appeal, you have 14
13    days from the date of my judgment.  My judgment will
14    probably be tomorrow or the next day, maybe Monday.
15    But you have 14 days thereafter to file a notice of
16    appeal.  Mr. Gray will do that for you, so talk to
17    him about appealing.
18               Mr. Gray, will you talk to him about
19    appealing and make sure the notice is timely filed?
20               MR. GRAY:  Yes, Your Honor, we will do
21    that.
22               THE COURT:  All right.  Anything else?
23    Any other -- how about institution?
24               Mr. Tromblay?
25               MR. TROMBLAY:  I just have one other
```

```
1    question, Your Honor.  Would the Court's sentence be
2    the same regardless of what the guidelines --
3              THE COURT:  What?
4              MR. TROMBLAY:  Is the Court's sentence the
5    same regardless -- would the Court's sentence be the
6    same regardless of what the guidelines would have
7    prescribed?
8              THE COURT:  Yes.
9              MR. TROMBLAY:  Okay.  That's it.
10             THE COURT:  Yeah, it would be the same.  I
11   hesitate, because I -- but no, I agree with you.
12             MR. TROMBLAY:  I understand.
13             MR. GRAY:  Your Honor, we had one request,
14   if we may, that Mr. Beard -- that the Court
15   recommend that Mr. Beard serve his time at the
16   Herlong facility in California.
17             THE COURT:  Okay.  And where in
18   California?
19             MR. GRAY:  It's the Herlong facility.
20             THE DEFENDANT:  Herlong is in Northern
21   California, Your Honor.  And it has a really good
22   UNICOR program to what Mr. Forsyth was talking about
23   for the restitution.  It has one of the higher
24   paying restitution programs, and I would like to try
25   to get into that program as soon as possible to make
```

```
 1   the restitution.
 2             THE COURT:  All right.  And tell your
 3   mother to stop filing cases against them, please.
 4             Will you tell her that?
 5             All right.  Never mind.
 6             Mr. Tromblay?
 7             MR. TROMBLAY:  Yes, ma'am.  We move to
 8   dismiss Count 1, which is --
 9             THE COURT:  Granted.
10             If there's nothing else, we will be in
11   recess.
12             I would like the defendant's people to
13   leave first, and then all the other people can
14   leave.
15             So wait until you have the word from the
16   CSOs that all of them have left, and then you can go
17   out.  Okay?
18             And thank you-all very much for coming.
19             We will be in recess.
20             (Court in recess at 3:03 p.m.)
21
22
23
24
25
```

1                C E R T I F I C A T E

2          I, Shawnie Archuleta, CCR/CRR, certify

3     that the foregoing is a transcript from the record

4     of the proceedings in the foregoing entitled matter.

5          I further certify that the transcript fees

6     format comply with those prescribed by the Court and

7     the Judicial Conference of the United States.

8          This 5th day of August 2023.

9

10

11                         s/Shawnie Archuleta
                          Shawnie Archuleta CCR No. 7533
12                        Official Court Reporter
                          The Northern District of Texas
13                        Dallas Division

14

15

16    My CSR license expires:  December 31, 2023

17    Business address:  1100 Commerce Street
                         Dallas, TX  75242
18    Telephone Number:  214.753.2747

19

20

21

22

23

24

25